NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3107
_____

UNITED STATES OF AMERICA

v.

PASQUALE STISO,
a/k/a Pat Stiso

Pasquale Stiso,
                    Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. No. 2-14-cr-00484-002)
District Judge:  Honorable William J. Martini
_____

Submitted Under Third Circuit LAR 34.1(a)
September 7, 2017

Before:  CHAGARES, JORDAN, and HARDIMAN, *Circuit Judges.*

(Filed: September 8, 2017)
_____

OPINION*
_____

_____

     * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge.*

On November 24, 2015, following a jury trial, Pasquale Stiso was convicted of wire fraud, money laundering, and conspiracy. He was sentenced to 43 months' imprisonment, to be followed by a three-year term of supervised release, and he was ordered to pay $460,000 in restitution. Stiso now appeals his conviction and sentence, arguing that the District Court erred in denying his motion for acquittal, in denying a motion to suppress the fruits of a wiretap warrant, and in applying the 2012 version of the sentencing guidelines, rather than the 2015 version. He further argues that the District Court committed plain error in failing to recognize eleven instances of prosecutorial misconduct. For the reasons that follow, we will affirm Stiso's conviction but will vacate his sentence and remand for further proceedings.

## I.    BACKGROUND

Stiso and his friend Paul Mancuso had a gambling problem. The problem was they were bad at gambling. Between 2010 and 2013, they racked up over $500,000 in gambling debts to Easy Play, a gambling website.[1] In 2011, Stiso started working with Mancuso to defraud several investors to raise money to pay off their debts.[2] All told,

---

[1] Mancuso was responsible for nearly all of the debt. However, because Stiso "vouched" for Mancuso, he was also held responsible. (App. 969 ("[Stiso] definitely told [Easy Play] that [Mancuso] is good, and he'll make sure that we get all our money. ... He vouched for the guy. So in this kind of a world when you bring a guy in, you're responsible for that guy if that guy turns bad.").)

[2] Mancuso had a history of perpetrating fraudulent schemes dating back to 2009.

2

Stiso and Mancuso defrauded five victims: Mark and Patricia Mezzancello, Ira Saferstein, and Robert and Richard Persico.

Stiso and Mancuso defrauded the Mezzancellos through a scheme involving tickets for sporting events. After meeting the Mezzancellos through an unrelated business venture, Mancuso contacted them claiming to have access to cheap sports tickets that, if purchased in bulk, could be resold for profit. Mancuso promised a two-to-one return on their money, and Stiso encouraged investment in the operation, telling the Mezzancellos that everyone makes money working with Mancuso and assuring them that Mancuso was legitimate. Because of their conversations with Stiso and Mancuso, the Mezzancellos invested $100,000 in Giants tickets on September 6, 2012. Based on similar assertions from Mancuso and Stiso, real estate development project, $100,000 in Yankees tickets,[3] and $100,000 in Justin Bieber concert tickets. As it turned out, none of the money they had "invested" was spent on real estate projects, concert tickets, or sports tickets. Instead, the money was used to pay Mancuso's and Stiso's personal expenses, including gambling debts.

As time passed and the Mezzancellos did not see any return on their investments, they started to worry. They called Stiso to find out what was happening, and Stiso assured them that their investments were legitimate and that they would see their returns. Eventually, Mancuso and Stiso met with the Mezzancello's attorney and Mancuso signed

---

[3] The Mezzancellos ended up wiring only $75,000 of the $100,000 for the Yankees portion of the scam. Mancuso and Stiso offered to roll the first $20,000 in "returns" from the Giants project into the Yankees investment, and added an additional $5,000 "credit" for combining the transactions.

3

a promissory note (to the benefit of the Mezzancellos) in the amount of $587,000. Stiso continued to assure the Mezzancellos that they would be repaid. The Mezzancellos never recovered their investment.

The facts are similar with respect to Ira Saferstein. After meeting with Mancuso, Saferstein agreed to invest $100,000 in a ticket scheme. He memorialized the investment with a promissory note. Contrary to Saferstein's expectations and Mancuso's description of the investment plan, Mancuso immediately transferred $12,000 (of the $100,000) to Stiso's personal bank account. Stiso later met with Saferstein and assured him that he would be able to recover his investment. In fact, the investments were never repaid.

Finally, Stiso and Mancuso defrauded Robert and Richard Persico. Stiso and Mancuso communicated with Richard Mach, the CFO of the Persicos' company, to encourage investment in an apartment complex. Based on Mancuso's assurances, Mach, acting on behalf of the Persicos, invested $100,000 in that real estate venture. As with the Mezzancellos, Mancuso also persuaded Mach to invest $60,000 in ticket sales. When Mach and the Persicos grew concerned that they were not seeing a return on their investment, Stiso assured Mach that they would see a return and advised him that he need not worry. As with the other schemes, the Persicos' money was not used to purchase tickets or real estate, but was instead transferred, at least in part, to Stiso's personal account and was used to pay personal expenses.

In December 2011, the FBI became aware of Mancuso's fraudulent activities. After conducting an investigation, it sought and obtained a warrant for a wiretap on Mancuso's telephones. The wiretap indicated that Stiso and Mancuso owed large

4

gambling debts to Easy Play, that Stiso and Mancuso were afraid of Easy Play's bookies, and that Stiso worked with Mancuso to perpetuate the fraudulent schemes just described. Importantly for present purposes, Stiso was recorded admitting to his involvement with Mancuso's debts and fraudulent schemes, saying in one call with Mancuso, "I'm involved in these things,  I'm involved [in] your decisions, I'm involved in everything that you decide that you do[.]"  (Supp. App. 56.; *see also* Supp. App. 65 ("[Y]ou don't realize how valuable I could, I am to this whole f***ing thing[.]").)

On October 14, 2015, Stiso and Mancuso were charged with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, six counts of wire fraud in violation of 18 U.S.C. § 1343, and three counts of money laundering in violation of 18 U.S.C. § 1957.  A jury later convicted Stiso on all counts, and this appeal followed.

## II.    DISCUSSION[4]

### A.    Motion to Suppress

Stiso argues that the District Court erred when it denied his motion to suppress the evidence obtained through the wiretap on Mancuso's telephone.  The crux of his argument is that the government omitted important information in its application for the wiretap warrant.  He says that "[t]he [g]overnment's affidavit in support of the wiretap ... failed to inform the Court that ... [Mancuso] was a source for the [g]overnment at the time the affidavit was submitted."  (Op. Br. 16.)  Stiso further contends that "Mancuso's status as a confidential informant abrogated the necessity of the [wiretap]" and that "the

---

[4] The District Court had jurisdiction under 18 U.S.C. § 3231.  We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

District Judge would not have authorized the [wiretap] had she known the full extent of Mancuso's cooperation[.]" (*Id.* at 17.)

> The rule governing situations involving allegedly misleading search warrant affidavits was articulated by the Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978). There the Court held that where the defendant proves by a preponderance of the evidence "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that ... the fruits of the search [must be] excluded ... ."

*United States v. Frost*, 999 F.2d 737, 742-43 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 155-56) (first three alterations in original).

The procedural mechanism used to "challenge the truthfulness of facts alleged in support of a search-warrant application" is known as a *Franks* hearing. *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012).

> The right to a *Franks* hearing is not absolute ... . The defendant must first (1) make a "substantial preliminary showing" that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or [omission of facts] are "necessary to the finding of probable cause."

*Id.* (quoting *United States v. Yusuf*, 461 F.3d 374, 383-84 (3d Cir. 2006)). The District Court denied Stiso's request for a *Franks* hearing and denied his motion to suppress.

"We have not yet identified the standard of review for a district court's denial of a request for a *Franks* hearing, and our sister circuits are divided on the correct approach." *Id.* at 665 n.10 (noting that the circuit courts disagree as to whether review is for clear error, or whether to apply a mixed standard of review in which legal determinations are reviewed de novo and factual determinations are reviewed for clear error). Once again,

6

we need not resolve this question, as Stiso's arguments would fail regardless of the standard of review.

The District Court was correct to deny Stiso's request for a *Franks* hearing. First, his arguments lack factual support in the record. While he claims that Mancuso "was a source for the [g]overnment at the time the affidavit was submitted[,]" (Op. Br. 16) he does not identify any part of the record supporting that claim. The District Court recognized as much, noting that "the record lacks any affidavit or declaration from Mancuso concerning his cooperation." (App. 37.) In order to make the "substantial preliminary showing" needed to obtain a *Franks* hearing, a defendant "cannot rest on mere conclusory allegations ... but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Yusuf*, 461 F.3d at 383 n.8.

But even if Stiso were able to show that the affidavit was somehow incorrect or incomplete, he would still not be entitled to a *Franks* hearing because he has not provided anything to show that the supposed problems with the affidavit were the product of knowing falsehoods or a reckless disregard for the truth. *Id.* at 383. Finally, Stiso's argument fails because he has not demonstrated how Mancuso's status as an informant, if disclosed, would have caused the magistrate judge to deny the wiretap warrant. *See id.* (explaining that the defendant must show that the misstatement or omission was material or necessary to the probable cause determination). The fact that Mancuso was an FBI informant would not change the fact that Mancuso was suspected of fraud, nor would it change the fact that the investigators did not want to alert Mancuso about the ongoing

7

investigation. The District Court reached the same conclusion, stating that "Stiso provides no explanation for why [Mancuso's status as an informant] is relevant to the finding of probable cause." (App. 37.) We agree. The fact that Stiso was not able to satisfy the preliminary requirements to obtain a *Franks* hearing necessarily means that he did not satisfy the more rigorous requirements needed to suppress the evidence under *Franks*. *See Franks*, 438 U.S. at 155-56 (explaining that, to obtain a hearing, a defendant need only make a "substantial preliminary showing" that a warrant was improperly obtained, whereas to prevail on the motion, the defendant must make the same showing by a preponderance of the evidence). We thus conclude that the District Court did not err when it denied Stiso's request to suppress the wiretap evidence.[5]

## B.      Discovery

Stiso argues that the District Court erred when it denied his request for discovery relating to Mancuso's confidential informant file. Stiso wanted to use the file to show that Mancuso perpetrated the fraudulent scheme at the behest of the FBI or that Mancuso deceived both Stiso and the FBI when perpetrating the fraudulent scheme.

---

[5] Stiso also argues that the wiretap evidence should be suppressed because the wiretap was unnecessary. That argument fails to address the substance of the affidavit filed in support of the warrant. The affidavit explains that a wiretap was needed to accomplish a broad array of investigative goals, including discovering the full scope of the fraudulent scheme, obtaining sufficient admissible evidence of the scheme, and identifying the location and nature of records and documents memorializing the scheme. Stiso's mere assertion that the wiretap was unnecessary is insufficient to counter that explanation. That is especially true given that the government "need only lay a factual predicate" explaining why a wiretap is necessary and that the reasoning of an affidavit should be evaluated "in a practical and common sense fashion." *United States v. Bailey*, 840 F.3d 99, 114 (3d Cir. 2016) (internal quotation marks omitted).

We review for abuse of discretion the District Court's denial of a request for discovery. *United States v. Hedaithy*, 392 F.3d 580, 605-06 (3d Cir. 2004). "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Id.* (quotation omitted). Speaking generally, "[i]n a criminal trial, the government is subject to three sets of disclosure obligations[.]" *United States v. Maury*, 695 F.3d 227, 247 (3d Cir. 2012). First, under the Jencks Act, defendants are entitled to a copy of "any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." *Id.* (quoting 18 U.S.C. § 3500(b)). The government is only required to produce the statement "[a]fter a witness called by the United States has testified on direct examination[.]" 18 U.S.C. § 3500(b). Second, Federal Rule of Criminal Procedure 16 requires the government to disclose, upon request, certain oral or written statements made by the defendant, as well as written records or recordings of statements made by the defendant during an interrogation or before a grand jury. *Maury*, 695 F.3d at 248 (citing Fed. R. Crim. P. 16(a)(1)). Additionally, the government must allow the defendant to review a variety of documents and tangible objects if "the item is material to preparing the defense[,]" "the government intends to use the item in its case-in-chief[,]" or "the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E)).

> Finally, independent of [the first two] obligations, under *Brady v. Maryland*, a prosecutor has an obligation to disclose evidence favorable to an accused individual so long as it is material either to guilt or to punishment. ... The prosecution must also disclose evidence that goes to the credibility of crucial prosecution witnesses. Referred to as *Giglio* material, this evidence is a

9

subset of *Brady* material insofar as it addresses situations in which certain evidence about a witness's credibility or motivation to testify exists, and where the reliability of a given witness may well be determinative of guilt or innocence.

*Maury*, 695 F.3d at 249 (internal quotation marks and citations omitted).

Stiso was not entitled to discovery because the information he sought did not fit into any of those categories of discoverable information. The Jencks Act did not apply because Stiso's discovery requests were made before the trial started and, in any case, Mancuso's informant record would not qualify as a "statement" under the Act. *See* 18 U.S.C. § 3500(e) (defining a "statement" as a written statement made by a witness, a transcription of an oral statement, or "a statement, however taken or recorded ... made by said witness to a grand jury"). Stiso was also not entitled to discovery under Rule 16, since Mancuso's informant file was not a statement made by Stiso, the government did not obtain the file from Stiso, the government did not intend to rely on Mancuso's status as an informant during its case-in-chief, and the file did not implicate Stiso's defense. *See* Fed. R. Crim. P. 16. Finally, Stiso was not entitled to discovery because Mancuso's informant file was not *Brady* material. A defendant may not obtain discovery simply by asserting that the desired materials contain exculpatory evidence. *See United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994) ("We think it unwise to infer the existence of *Brady* material based upon speculation alone."). "[U]nless a defendant is able to raise at least a colorable claim that [the desired information] contained evidence favorable to [him] ... no constitutional error or violation of due process will have been established." *Id.* (quoting *United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981)) (third alteration in *Ramos*).

10

In opposing Stiso's request for discovery, the government assured the Court that it had "gone through and fully reviewed" Mancuso's informant file and concluded that the file did not contain any *Brady* material and that there was "nothing implicating Mr. Stiso's defense[.]" (App. 129-30.) Stiso has not identified any basis, apart from mere speculation, on which we can conclude that the requested materials contain exculpatory information.[6] Accordingly, we will affirm the District Court on this issue.

## C. Prosecutorial Misconduct

Stiso argues that, over the course of his trial, the prosecution engaged in 11 instances of prosecutorial misconduct. He maintains that, viewed instance-by-instance or collectively, the misconduct he cites should result in a reversal of his conviction. Because none of his objections were adequately preserved, we review each for plain error.[7] *United States v. Olano*, 507 U.S. 725, 731-32 (1993) (discussing Fed. R. Crim. P. 52).

---

[6] Stiso does not argue (and did not argue below) that Mancuso's informant file contains *Giglio* information, nor has he suggested that the contents of the file could be used to challenge the credibility of a government witness. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). We thus conclude that there is no discovery problem under either *Brady* or *Giglio*.

[7] For plain error to exist, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'" *Olano*, 507 U.S. at 732 (alteration in original) (quoting Fed. R. Crim. P. 52(b)). An error is "plain" if it is "clear" or "obvious." *Id.* at 734. "[A]n error will be deemed to have 'affected substantial rights' where it is prejudicial" – that is, where it has "affected the outcome of the District Court proceedings." *United States v. Turcks*, 41 F.3d 893, 897 (3d Cir. 1994) (quoting *Olano*, 507 U.S. at 734). Finally, even if we find plain error, we do not correct the error unless it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

11

The alleged misconduct is laid out in what is roughly an ascending order of seriousness. The first six of Stiso's objections involve claims that the government mischaracterized evidence during closing arguments. Each fails under plain error review. At the start, we note that Stiso is fighting an uphill battle on this issue. Prosecutors are "entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991) (citing *United States v. Scarfo*, 685 F.2d 842, 849 (3d Cir. 1982)); *see also United States v. Lee*, 612 F.3d 170, 194 (3d Cir. 2010) (same). "[T]he appropriate inquiry is whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate the defendant's due process rights." *Werme*, 939 F.2d at 117 (quoting *Scarfo*, 685 F.2d at 849).

Stiso's first objection relates to the government's characterization of his bookie, John DiGiacomo. DiGiacomo was a government witness who testified about Stiso's and Mancuso's gambling debts. During closing arguments, when discussing motive, the prosecutor stated:

> [T]hey were up to their eyeballs in debt to John DiGiacomo and Robert Wagner, and these are men that you can't be indebted to. You saw John DiGiacomo for yourself. You heard him say he doesn't go straight to violence, but I think we all know what happens if you don't pay him: They don't file a lawsuit. Okay? They don't foreclose, not in the traditional sense anyway. I mean, they may foreclose on something else, but it's not going to be your mortgage.

(App. 1237.) Stiso argues that the government's characterization was directly contradicted by DiGiacomo's trial testimony. During DiGiacomo's direct examination, the government asked DiGiacomo whether he used violence to collect on his debts:

12

Q: So if you have a gambler that's not paying you, do you try to intimidate the gambler or scare the gambler? What do you do to get that money?

A: Well, I try to do it in a tactful way. The violence doesn't work, so you try to use your brain and to come up to make the guy pay the money.

Q: And why do you try to do that?

A: Because if you beat the guy up he's not going to pay you anyway."

(App. 963.)

The problem with Stiso's arguments is that the government's characterization of DiGiacomo was supported by other evidence in the record. In a wiretapped conversation, DiGiacomo ominously warned Stiso and Mancuso that if they did not pay their debts "it's getting handled[.]" (SA 23.) In other recorded calls, Stiso expressed his belief that the debt collectors "chop people up" (SA 36) and that "[t]his is not money anymore ... it's safety [and] security[.]" (SA 67.) In light of those statements, the government's characterization of DiGiacomo was not unreasonable. The District Court's allowance of the statement was not error, let alone plain error.

Stiso's second objection relates to the government's discussion of phone logs during closing arguments. While the phone logs had not been discussed during either party's case-in-chief, both sides had stipulated to the logs' admission into evidence. The logs showed a series of calls between Stiso and Mancuso, Stiso and Wagner (to whom he owed money), and Stiso and his bank. The government cross-referenced the dates from the phone logs with the dates of the fraudulent wire transfers to support its argument that "[Stiso] knew the money was coming" and to show that Stiso had purposefully deceived Mancuso's investors. (App. 1308.) Stiso now objects that the government's description

13

of the phone logs was improper because the prosecutor stated that he "did an analysis of [the logs]." (App. 1303.) Aside from the unsupported assertion that the government "improperly insert[ed] [its] own facts and commentary into the record[,]" (Op. Br. 32) Stiso does not explain why the government's argument was improper. When the comments are viewed in light of the record as a whole, there is no error. The government presented the stipulated phone logs and explained how they were consistent with its theory of the case. That is not a basis for reversal.

Stiso's third argument relates to the government's characterization of the promissory note executed by Mancuso and the Mezzancellos. During closing argument, the government stated: "Don't let them play the unwitting dupe, ladies and gentlemen. The money trail shows he knew ... . They promise[d] repayment to the Mezzancellos in the form of a promissory note and the Matawan property." (App. 1230.) Stiso takes issue with the phrase "*They* promise[d] repayment ... ." (*Id.* (emphasis added).) Stiso argues that the government's characterization of the evidence is directly at odds with trial testimony, which made clear that Stiso was not a party to the promissory note. During the trial, Mezzancello confirmed that "Stiso's name appears nowhere on [the] promissory note[,]" that Stiso did not sign the note, and that no one expected him to be subject to the note. (App. 520-21.) While the trial testimony makes it clear that Stiso did not sign the promissory note, that does not, in and of itself, show that the government's description of the evidence was incorrect. The government did not claim that Stiso signed or was a party to the promissory note. Instead, it simply stated that Stiso and Mancusso ("they") "promise[d] repayment ... in the form of a promissory note[.]" (App. 1230.) Given that

14

the government's theory was that Stiso and Mancusso worked together to perpetuate their fraud, it is not a surprise that the government would also argue that they were both involved in deferring the day of reckoning with a promissory note. The fact that Mezzancello was not aware of Stiso's involvement is not inconsistent with that theory. The Court's allowance of the government's description of the promissory note was not plain error.

Stiso's fourth complaint is that the government misrepresented the evidence when it stated that "all the victims testified that they did not authorize their money to go to anything but investments." (Op. Br. 35 (quoting App. 1214) (emphasis omitted).) Stiso argues that that statement was incorrect because two of the victims, Richard and Robert Persico did not testify at the trial. Instead of calling the Persicos, the government called Richard Mach, the Persicos' CFO. Mach explained that he was responsible for transferring the Persicos' investment funds, that he had transferred the funds at issue in this case, and that, as far as he knew, those funds were only to be used as investments. Because Mach represented the Persicos and the Persicos' interests, it was not unreasonable for the government to characterize Mach's voice as that of his employers'. There is no plain error here.

Stiso's fifth argument is that the government misrepresented evidence by arguing that he knew about one of Mancuso's previous victims (Giovanni Manna) but failed to warn future victims. That complaint fails because there is evidence in the record supporting the statement. During the trial, one of the government's witness testified that

15

he had told Stiso about Giovanni Manna's experience with Mancuso.[8]  Once again, there is no plain error.

Alleged misconduct number six relates to the government's discussion of a notebook that had been recovered from Stiso's home.  Despite direct evidence to the contrary, the government claimed that the notebook was "in [Stiso's] own handwriting, and that's proof positive that he knew all along these weren't loans."  (App. 1302; App. 1067-68 (FBI agent explicitly stating that there was no indication whose handwriting appeared in the notebook).)  The government concedes that the prosecutor's remarks were in error but argues that the error did not cause any prejudice.  We agree.  First, any prejudicial effect was likely cured, either by the defense's rebuttal summation, or by the Court's jury instructions.  During its rebuttal statement, Stiso's counsel pointed out the obvious flaw in the government's argument, reminding the jury that "[w]e don't have any proof" that the notebook was in Stiso's handwriting.  (App. 1281.)  Additionally, the jury was reminded, both before and after closing statements, that the lawyers' statements during closing arguments were not evidence and that they were only to consider the evidence presented during the trial.  Given the state of this record, that instruction renders the prosecutor's misstep harmless.  *See United States v. Wood*, 486 F.3d 781, 789 (3d Cir.

---

[8] After presenting his fourth and fifth arguments, Stiso argues that the government's errors, as they relate to Mach and Manna, violated his Sixth Amendment right to confront witnesses against him.  This argument is without merit.  Stiso had the opportunity to cross-examine both of those witnesses, and all of the government's arguments were supported by the record.  Contrary to Stiso's claims, the prosecutor did not "inform[] the jury that there is a witness who has not testified, but who, if he had testified, would have given inculpatory evidence."  (Op. Br. 36 (quoting *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996)).)

16

2007). The question of whose handwriting is in the notebook was relatively insignificant, especially in light of the strong evidence supporting Stiso's conviction.

Stiso's seventh misconduct charge is that the prosecutor "improperly set forth [his] personal belief of the weight of the evidence and [Stiso's] guilt" (Op. Br. 38) when he stated: "We're going to prove to you how he's directly guilty, and I think we have, but I think you can also find him guilty if he aided and abetted." (*Id.* (quoting App. 1219).) Stiso offers no support for his conclusion that the government's statement was improper, and does not explain how the statement would prejudice the jury. We have cautioned prosecutors against using personal pronouns in closing statements. *See United States v. Walker*, 155 F.3d 180, 189 (3d Cir. 1998) ("[I]t is poor practice for federal prosecutors to frequently use rhetorical statements punctuated with excessive use of the personal pronoun 'I'. Such a practice runs the risk that the words that follow will convey the personal view of the prosecutor to the jurors."). But while statements such as "I think we have" are typically "not 'acceptable,' they do not merit reversal unless the summation viewed as a whole" is improper. *United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996) (alteration in original) (internal quotation marks omitted); *see also Walker*, 155 F.3d at 188-89. Viewed as a whole, the use of the personal pronoun in the government's closing statement is not a basis for reversal. The statement was brief, did not refer to any specific aspect of the case, and was forward-looking. Given that the "use of the pronoun 'I' does not automatically wreck the case," *id.*, we are not inclined to find plain error here, let alone a plain error that amounts to a "manifest miscarriage of justice." *See United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003).

17

Stiso's eighth argument is that the government improperly appealed to sympathy for the victims during its closing argument. During the argument, the prosecutor stated: "So now I bid you: Go do the work that you're obligated to do. Apply that law equally. Give Mr. Mezzancello the justice he asked you for. Give the victims the justice they asked you for." (Op. Br. 39 (quoting App. 1310).) Stiso objected at trial, and his objection was sustained. That ends the matter. To the extent Stiso thinks that the prosecutor's comments required a mistrial or a curative instruction, that argument has been forfeited, as he did not request that relief at trial, nor does he do so on appeal. *United States v. DeMichael*, 461 F.3d 414, 417 (3d Cir. 2006) (citing *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp*., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief ... .")).

Complaint number nine is that the government improperly shifted the burden of proof and production to Stiso during its rebuttal. During the government's closing argument, the prosecutor stated: "I waited for [Stiso's counsel] to attack the bank records. He didn't. I waited for him to explain the recordings. He didn't. ... [Stiso's counsel] doesn't address those points."[9] (Op. Br. 41 (quoting App. 1300-01).) Again, while the point could perhaps have been made more artfully, the government is allowed to identify flaws or gaps in a defense theory. *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996) (finding no plain error where the prosecutor stated "Now what [defense counsel]

---

[9] At trial, Stiso objected to those statements, but his objection was not that the government engaged in impermissible burden shifting; rather, it was that the statements mischaracterized the record. Therefore, the argument presented here was not preserved and we review the objection for plain error.

18

never tells you ... is why he was there. What was he doing there[?]" (third alteration in original)). There is no plain error here, and, in any event, the Court plainly informed the jury that "it's the [g]overnment's burden at all times to prove its case." (App. 1303.)

Stiso's tenth argument is that the government improperly vouched for the credibility of its witnesses. During closing arguments, the prosecutor said: "[Y]ou should believe the victims. [Opposing counsel] should believe the victims for a number of reasons. They're all self-made hard working individuals with no reason to lie in this case." (App. 1195.) Stiso also objects to statements made in the government's rebuttal, specifically that "Mr. Mezzancello told you the truth" and that "[i]t's not plausible that everyone from all the different walks of life ... got up before a Federal Judge just to lie to you folks. It's not plausible. It makes no sense. The Defense is illogical." (App. 1300, 1308.) In order to show that a prosecutor improperly vouched for a witness, a defendant must show that the prosecutor "assure[d] the jury that the testimony of a [g]overnment witness is credible" and the assurance must be "based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *Walker*, 155 F.3d at 187). The government's argument here was pressed with enough vigor and verbiage to get uncomfortably close to vouching, but, viewed in context, it was sufficiently based on the record to prevent our saying there was plain error.

Stiso's eleventh and final claim of misconduct is the most serious. It is that the government ignored an order from the judge to refrain from using the term "loan shark." (Op. Br. 46; App. 191-92.) The government concedes that the prosecutor acted

improperly. Prior to opening statements, Stiso sought to prevent the prosecution from "introducing loaded terms [like] 'loan shark' or 'shylock' or 'usury' that have no place in the case other than to inflame the jury and potentially confuse the jury." (App. 190.) The Court agreed, and instructed the prosecutor to refrain from using those or similar terms during the opening statement and throughout the trial. Nevertheless, during the prosecution's examination of DiGiacomo, the following exchange took place:

Q: And the guy that you borrow money on the street from, is he referred to as someone, like a fish?

A: A shark, a loan shark?

Q: What's his name?

A: A shark.

Q: Loan shark. Right?

A: A loan shark, yeah.

(App. 1014.) While Stiso did not object at trial, he now contends that there was plain error here. We disagree. While there is no doubt that the government attorney acted improperly by violating the District Court's clear instructions,[10] we do not see, and Stiso does not show, how the improper statement was so prejudicial as to warrant a reversal of his conviction. Notably, the loan shark testimony did not relate directly to any of the elements required for conviction. To the extent that the testimony touched on motive,

---

[10] We trust that the United States Attorney for the District of New Jersey has taken or will take appropriate disciplinary steps. That the Assistant United States Attorney's flagrant disregard of the District Court's instruction has not resulted in reversal does not mean it can be taken lightly.

20

there was bountiful other evidence in the record showing that Stiso and Mancuso had considerable gambling debts and that they were afraid of the people to whom they owed money. *See Werme*, 939 F.2d at 117 ("[T]he appropriate inquiry is whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate the defendant's due process rights." (quoting *Scarfo*, 685 F.2d at 849)). Given the circumstances, we do not think that the error here affected Stiso's substantial rights and decline to exercise our discretion to reverse the conviction.

Finally Stiso argues that the cumulative effect of the eleven claimed errors warrants reversal of his conviction, but that which is insufficient one by one is also, in this case, insufficient all together. The cumulative effect of the points complained of does not warrant reversal. *See United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994).

### D.      Motion for Acquittal Under Rule 29

At the close of the prosecution's case-in-chief, Stiso moved for acquittal on all counts under Federal Rule of Criminal Procedure 29. The Court reserved judgment on the motion, but eventually denied it. Stiso now appeals that denial with respect to counts 2, 4, and 7 of the indictment. **.]** Those counts correspond to the $100,000 ticket scheme involving Ira Saferstein, the $100,000 real estate investment scheme involving the Persicos, and the $60,000 ticket scheme involving Robert Persico. "We exercise plenary review over a district court's ... denial of a motion for acquittal based on the sufficiency of the evidence[.]" *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008) (citing *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

21

> We apply a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence. It is not for us to weigh the evidence or to determine the credibility of witnesses. Rather, we must view the evidence in the light most favorable to the government and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (internal quotation marks and citations omitted).

In arguing that the evidence presented at trial was insufficient to sustain his conviction, Stiso points to pieces of evidence indicating that Saferstein had not met Stiso prior to investing, that Stiso did not induce Saferstein to invest, and that Stiso did not induce the Periscos to invest in the fraudulent schemes. His argument, however, does not adequately address the elements of wire fraud. In order to prove its case, the government was required to show "(1) a scheme ... to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of ... wire transmissions in furtherance of the scheme." *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012) (citation omitted). Stiso's arguments fail to rebut the government's proof on any of those elements. Indeed, as described above, the evidence introduced at trial showed that Saferstein and the Persicos invested hundreds of thousands of dollars into ventures that did not actually exist. The evidence further shows that Stiso participated in those fraudulent schemes. Specifically, there was evidence that, in an effort to perpetuate the scheme, Stiso spoke with Saferstein and assured him that his (Saferstein's) money was recoverable. The evidence also showed that, at that point, Stiso had already received and spent some of Saferstein's money. The evidence likewise

22

shows involvement with respect to frauds perpetrated on the Persicos.  Viewing all the evidence in the light most favorable to the government, it is clear that a rational jury could have concluded that Stiso was an active participant in the schemes laid out in the three challenged counts. The District Court's denial of the motion to acquit was proper.

### E.  Sentencing Guidelines

Finally, Stiso challenges his sentence.  He argues that the District Court improperly applied the 2012 version of the sentencing guidelines, rather than the 2015 version.  "We exercise plenary review over whether the District Court applied the correct version of the Sentencing Guidelines." *United States v. Brennan*, 326 F.3d 176, 197 (3d Cir. 2003) (citation omitted).  We review the sentence imposed "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).  Our process of review takes place in two steps.  We "must first ensure that the district court committed no significant procedural error ... ." *Id.* at 51.  We then consider the "substantive reasonableness of the sentence... ." *Id.*  A district court judge "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 50 (citation omitted); *United States v. Merced*, 603 F.3d 203, 215-16 (3d Cir. 2010) ("In all cases ... the district court must set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." (internal quotation marks and citations omitted)).

In general, courts apply the version of the sentencing guidelines in effect at the time of sentencing.  U.S.S.G. § 1B1.11(a).  But if the guidelines are amended after the

23

date of the offense in a way that would lead to a harsher punishment, "the court must apply the [g]uidelines as they existed at the time of the crime." *Brennan*, 326 F.3d at 197 (citation omitted); *see also* U.S.S.G. § 1B1.11(b)(1). To do otherwise would raise concern that a defendant's rights under the Ex Post Facto Clause of the Constitution were at risk.

In deciding to apply the 2012 version of the guidelines, the District Court stated, "I'm of the opinion that the 2012 guideline book is applicable. That's the date of the offense and that typically is what the guideline recommends that you use unless there is an ex post facto issue. But, if I use the 2012, there will not be an ex post facto issue." (App. 1374-75.)

Unfortunately, the Court misunderstood the relevant guidelines provisions. Under the 2012 version of the guidelines, Stiso was subject to a 14-level enhancement for the losses sustained from his crime. Under the 2015 version, he was subject to a 12-level enhancement. However, the 2015 version of the guidelines added a provision that required the District Court to increase the offense level by two if the offense "resulted in substantial financial hardship to one or more victims[.]" U.S.S.G. § 2B1.1(b)(2)(A). In sum, the 2015 version of the guidelines would result in a lower offense level than the 2012 version, unless the District Court found that the "substantial hardship" enhancement applied, in which case the offense level would be the same as that in the 2012 version. In either case, § 1B1.11 would require the judge to apply the 2015 version of the guidelines, as that version was in effect at the time of sentencing and did not require a harsher

24

punishment.[11]  Because the Court erroneously applied the 2012 version of the guidelines, we will remand the case for further proceedings.  *See Merced*, 603 F.3d at 214 (explaining that "[i]f the district court commits procedural error, our preferred course is to remand the case for re-sentencing without going any further." (citation and footnote omitted)).[12]

## III.  CONCLUSION

For the foregoing reasons, we will affirm Stiso's conviction, vacate his sentence, and remand to the District Court for further proceedings consistent with this opinion.

---

[11] The District Court did not make a determination on the record as to whether the hardship enhancement applied.

[12] It appears that the District Court judge may have applied the 2012 version of the guidelines to avoid an ex-post facto issue identified in the PSR.  The PSR indicated that the fraudulent schemes underlying Stiso's conviction caused $560,000 in loss, and thus that Stiso would have a total offense level of 26 under the 2015 guidelines and 24 under the 2012 guidelines.  **[PSR  55.]**  At sentencing, however, the District Court accepted a stipulation that the amount of loss was only $460,000.  **[App. 1371-72.]**  In light of that stipulation, it appears that the 2015 guidelines would result in an offense level that is equal to or less than the level that would result from the 2012 guidelines.